### WHITE et al. v. UNITED STATES.*
### No. 6156.

Circuit Court of Appeals, Fifth Circuit.
Nov. 12, 1931.

·Rehearing denied December 14, 1931.

C. A. Mays, of Greenwood, S. C., for appellants.

Chas. L. Redding, U. S. Atty., and George Noble Jones, Asst. U. S. Atty., both of Savannah, Ga., Annabel Hinderliter, Bayless L. Guffy, J. T. Brady, and T. J. Williamson, U. S. Veterans' Bureau, all of Washington, D. C., and Harry A. Wallerstein, U. S. Veterans' Administration, of Atlanta, Ga., for the United States.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

This was an action, instituted in 1930, on a war risk policy or certificate, issued during the World War to Miss Elizabeth White, an army nurse, who died on March 17, 1920. The petition alleged that premiums on said insurance contract were deducted from the insured's army pay until the time of her discharge from the Army on or about April 19, 1919, the payment of no further premiums being alleged, and that the insured was totally and permanently disabled from on and before that date until the time of her death. The only issue of fact raised was as to whether the insured did or did not become totally and permanently disabled while the policy was in force. The evidence bearing on that issue consisted of the testimony of two physicians, two sisters of the insured, and Mrs. Mabel H. Ashley, witnesses introduced by the plaintiffs, and the testimony of Dr. Sydenstricker, a witness introduced by the defendant. Upon the conclusion of the evidence, the court granted a motion for a directed verdict in favor of the defendant.

Evidence without conflict showed the following: Before the insured went into the Army as a nurse, she was not a very robust woman, but she carried on her work as a nurse in Augusta, Ga., where she was for some time before the war. She was a very great favorite with the doctors and very much beloved by her patients, having an extensive

nursing practice.' The Adjutant General's record of the military service and treatment of the insured covering the period of her service as nurse in the Army showed that she had no disability at the time of her discharge with the exception of defective vision which had not been impaired as a result of her service as an army nurse, and which had not deteriorated during her service as a nurse. From about June 1, 1919, until a few weeks before she went into a hospital a few days before her death, she did private nursing in Augusta when she was able to do so. Her death was caused by lymphatic leukemia, a very rare disease, of which there are two types, acute and chronic. That she had that disease was not known or discovered until after she went to a hospital on March 12, 1920. She stated to Dr. Sydenstricker, the physician who examined and treated her in the hospital, and made a written record of her statements to him, that she had been generally in fairly good health, or she so considered it; that she had had influenza on three successive occasions, September, 1918, April, 1919, and January, 1920. She dated the illness she had when she was examined by Dr. Sydenstricker as beginning three weeks prior to her admission to the hospital, and said she had not felt well since her last attack of influenza in January, and the enlargement of the glands in the body since that attack of influenza in January, and that three weeks before admission to the hospital she had developed a complete loss of appetite, some nausea, and some sensation of illness in her stomach. The evidence as to the insured's condition prior to her last illness covered a period from about March 20, 1919, until she entered the hospital. The following is a summary of facts deposed to by witnesses whose testimony is relied on by the appellants: Mrs. Yeldell, a sister of the insured, stated that just as soon as the insured came out of the Army she visited the witness at the latter's home at Greenwood, S. C., from about the 14th of March, 1919, until March 20, 1919. At that time, the insured was very nervous, very pale, she had no appetite, and was weak. Witness saw the insured again in June, 1919, when she went to a hospital with the witness, but not as a patient. The insured was very nervous at that time. It was at that time that Dr. Goodrich saw and treated the insured. Witness saw the insured again in December, 1919. At that time the insured was very nervous. Mrs. Fulcher, another sister of the insured and the beneficiary named in the policy, stated: The first time witness saw the insur-

ed after she came out of the Army was at McBean, Ga., about March 20, 1919. The insured stayed there until about the last of May, 1919, or the first of June. While there she was very pale, very nervous, and very thin. About the end of May or near the first of June, the insured went back to Augusta. From that time until insured died in March, 1920, witness would see her once and sometimes twice during the week. Sometimes insured was on duty, and sometimes she was not. Witness could not see any improvement in insured's condition. Shortly after the insured came back to Augusta, Dr. Bernard treated her for a bowel trouble. He kept no record of his treatment, because the insured was a nurse and friend. The intestinal trouble for which he treated her was followed by a period of some weeks of a little fever, and she was not nourished, and looked white or anemic, and did not look well or feel strong. Witness kept in touch with the insured for perhaps six or eight weeks. About that time, insured had her tonsils taken out. The witness knows of no relationship between intestinal trouble, or tonsil trouble, and leukemia. Dr. Goodrich stated that he recalled treating the insured on several occasions during 1919 and 1920. Being a nurse in Augusta, the witness made no charges and kept no record. At one time she had symptoms suggesting a gall bladder condition. Her general appearance indicated that she was not well. She had a peculiar pallor, and her complexion suggested anemia. Mrs. Ashley testified to the following: The witness became acquainted with the insured in September, 1919, at the University Hospital where witness was a patient under observation, walking around in the hospital. The insured was nursing a Mrs. Law, an old lady. Witness could tell that the insured felt badly, and that she was weak. She was extremely nervous. The insured was on Mrs. Law's case about ten days. She left the hospital a few lays before witness was taken seriously ill, and went to Atlanta. The insured came back from Atlanta when telegraphed for, and nursed the witness about six weeks, beginning October 10, 1919. During that time, the insured was weak. The case of the witness was a light one after the first ten days. The insured then had only the care of the baby of the witness, born in the hospital, an incubator baby. During the last two weeks of the nursing of witness by the insured, the latter looked like she was about to give out. The other four weeks she worked fairly well. After the insured went to Atlanta, witness

and her doctor tried to get a nurse at the hospital, and could not get one there. It was right after the War, and it was almost impossible to find a nurse anywhere. Dr. Sydenstricker's testimony showed the following: He examined and treated the insured after she came to the hospital and until her death. He examined her blood. It showed what witness then called acute lymphatic leukemia. Leukemia is a disease of unknown cause, which produces a great increase of the white blood cells of the blood along with enlargement of the lymphatic glands and the spleen and liver, and changes in the blood and large blood vessels, which are conducive to hemorrhage and usually a rather marked destruction of the red blood cells, so that the patient is generally anemic. If the history of the insured showed that she had had three spells of influenza and a marked pallor for a period of a year before she died, the pallor would indicate the possibility of leukemia, in view of the final end. The witness believes he was wrong in diagnosing the insured's disease as acute lymphatic leukemia because since that time it has been discovered that the blood test of the insured was not one that would conform to acute leukemia. The witness stated: "The history of Miss White's trouble is entirely inadequate on which to base an opinion as to its origin and duration." There was no evidence controverting the just quoted statement of the witness.

■ The above-mentioned instruction was not erroneous if there was no evidence having a substantial tendency to prove that while the policy was in force the insured became totally and permanently disabled, which means, not incapacity to do any work at all, but such impairment of capacity as renders it impossible for the disabled person to follow continuously any substantially gainful occupation. United States v. McPhee (C. C. A.) 31 F.(2d) 243; Blair v. United States (C. C. A.) 47 F.(2d) 109. One's disability is not kept from being total by reason of the fact that it is physically possible for him to do some gainful work at times, if his doing so involves a risk of seriously impairing his health or aggravating an ailment from which he suffers. United States v. Acker (C. C. A.) 35 F.(2d) 646. Within the meaning of the word "continuously," as used in the above-stated definition, one properly may be regarded as able to follow continuously a substantially gainful occupation, though at times, by reason of fatigue due to prolonged exertion, or temporary illness, he is unable to work in his occupation. Interruptions of one's work due to an attack of influenza, to an intestinal disturbance, or a gall bladder trouble, to the removal of his tonsils, or any temporarily disabling cause, may be consistent with what is meant by ability to follow continuously a gainful occupation. During a given time a woman nurse, within the meaning of the stated definition, may be able to follow continuously some substantially gainful occupation, though during parts of that time she was unable to work, immediately following the termination of her services as an army nurse, or during or soon after an attack of influenza, a bowel trouble, or other temporarily disabling ailment. Ford v. United States (C. C. A.) 44 F.(2d) 754; Carter v. United States (C. C. A.) 49 F.(2d) 221.

■■ Nothing in the record indicates that prior to nearly ten years after the insured's death the idea that the insured became totally and permanently disabled while the insurance was in force occurred to any one. A finding that while the policy was in force she had the totally disabling disease from which she died would be a mere guess or conjecture, unsupported by any evidence tending to prove that such was a fact. Such a finding could not properly be based on the circumstance that, before the existence of the disease was discovered, her condition shown by evidence was consistent with the possibility that she then had that disease. The burden was on the appellants to prove that the insured became totally and permanently disabled while the policy was in force. The evidence showed that the insured worked as a private nurse during a considerable period beginning about June 1, 1919. If during that time, when there was an unusual scarcity of nurses, there frequently was available to an experienced nurse, never robust, who was a great favorite with the doctors of the community in which she practiced, substantially remunerative nursing tasks of a kind which such a nurse was able, except when disabled by temporary illness, or by fatigue due to prolonged nursing, to perform without risking a serious impairment or deterioration of her health, it cannot properly be said that it was impossible for such a nurse so situated to follow continuously any substantially gainful occupation. The only evidence as to the nursing cases undertaken by the insured after she resumed nursing on or about June 1, 1919, showed that she completed those tasks, and there was no indication that her work as a nurse was subject to criticism. There was no evidence furnishing a support for a finding that, during the time the insured actually

568

was engaged in nursing, her condition was such, except when she was disabled by temporary illness, as to keep her from doing substantially gainful nursing work, but of a lighter or less exacting kind than that sometimes actually undertaken by her; or that she could not have obtained, and without injury to herself performed, such work if she had been duly prudent in making selections from the nursing tasks which were available to her. Evidence that the insured undertook some nursing cases which turned out to be such as to overtax her strength, has no tendency to prove that she was disabled from doing any substantially gainful nursing work. Unless, while the policy was in force, the insured became disabled from following with substantial continuity any substantially gainful occupation, though differing from the one she previously had followed, for which she was equipped by training and experience, liability under the policy did not accrue. Nicolay v. United States (C. C. A.) 51 F.(2d) 170, 171. There was no substantial evidence tending to prove that while the policy was in force the insured became so disabled; no evidence adduced negativing the conclusion that, after the expiration of that time, she was able to follow continuously the occupation of nursing in doing substantially gainful kinds of nursing which were available to her. The evidence was such that the court properly could have set aside a verdict involving a finding that the insured became totally and permanently disabled while the policy sued on was in force. This being so, the above-mentioned ruling was not erroneous.

The judgment is affirmed.