## UNITED STATES v. FLY.
### No. 9331.

Circuit Court of Appeals, Eighth Circuit.
April 19, 1932.

C. L. Dawson, Atty., Veterans' Administration, of Washington, D. C. (William L. Vandeventer, U. S. Atty., and Claude E. Curtis, Asst. U. S. Atty., both of Kansas City, Mo., William Wolff Smith, Sp. Counsel, Veterans' Administration, of Washington, D. C., and Vergil E. Willis, Ins. Atty., Veterans' Administration, of Kansas City, Mo., on the brief), for the United States.

Warren M. Turner, of Springfield, Mo. (Ben M. Neale and Charles F. Newman, both of Springfield, Mo., on the brief), for appellee.

Before STONE, KENYON, and GARDNER, Circuit Judges.

STONE, Circuit Judge.

This is an action upon a war risk insurance contract. From a recovery thereon, the government brings this appeal.

The parties agree that the only issue at the trial was whether plaintiff was totally and permanently disabled. The issues presented here are the sufficiency of the evidence to warrant submission to the jury, and the propriety of a portion of the charge to the jury.

The appeal has been ably and fairly presented by counsel of both sides.

The major issue here is the sufficiency of the evidence. Departmental regulations, decisions of this court and of other courts, have fixed the definition of total disability as meaning inability to follow continuously any substantially gainful occupation. John R. Green v. U. S., 57 F.(2d) 9, this court, March 22, 1932; U. S. v. McGill, 56 F.(2d) 522, this court, February 16, 1932; U. S. v. Perry, 55 F.(2d) 819, this court, January 18, 1932; McNally v. U. S., 52 F.(2d) 440, 441, this court. Whether total disability (within this definition) exists in any particular case is, of course, factual in nature and must be determined solely from the evidence therein. After verdict, the question is as to the existence of any substantial evidence in support thereof. Our inquiry is as to the existence of any substantial evidence to support the verdict of this jury which found that appellee was totally and permanently disabled. Our conclusion is that the evidence failed in this requirement, and that a verdict should have been directed for the government. This conclusion is inescapable because of one undisputed matter which is determinative. In this view, it is unnecessary and would serve no useful purpose to review all of the evidence, although every word of it has been carefully read and considered. It is necessary only very briefly to sketch the evidence leading up to this determinative fact and then to state, somewhat in detail, the evidence as to that fact.

This preliminary sketch is as follows. When about twenty-two years old, appellee entered the Army in January, 1918. After training in this country and preliminary training in France, he went into front line trenches where, on August 10, 1918, he was subjected to a shell and gas bombardment lasting about eighteen hours. Because of the difficulty of keeping his gas mask on continuously, he "got some gas," which affected his throat and lungs. Some six to eight days later, he was relieved and went into rest camp where he received treatment with vapor spray for the gas, but did not enter a hospital. From this rest camp he went into the St. Mihiel offensive, and was there wounded (September 12, 1918) by a machine gun bullet which entered his right heel and ranged upward into the calf of the leg. This bullet was removed three days later, and he remained in the hospital until returned to this country, and afterwards un-

til he went home, to Aurora, Mo., on furlough, in December, 1918. In January, 1919, he went to Fort Riley, and was discharged. When he entered the Army, he was a barber at Aurora. After his discharge, he tried as a barber for a short while and went to Springfield attempting the same for six or eight weeks. He then returned to Aurora in the summer of 1919 and was a member of a railway section gang and a barber until the fall and winter of 1920. Then he returned to Springfield to take up vocational training with a salesmanship and business objective. While taking this training, he worked as extra barber in the evenings. He left this course of training because he thought his educational qualifications insufficient, and, in 1921, took up vocational training at Sparta with embalming as an objective. The place of training was removed to Springfield. He seems to have given up this training and went to Marshfield in 1921, where he attempted his old trade as a barber. At some time not revealed in the evidence, he went again to Sparta, and for some time (until in 1924) did nothing. In 1924, there seems to be further training as an embalmer, in Springfield, during which he did some work as a barber. In 1925, he returned to Sparta where for about three years he endeavored to maintain himself as a barber and as an embalmer and funeral director. Probably in 1928, he went to Marionville, where he endeavored to pursue the same vocations. Then he went to Greenfield and afterwards to Chadwick, at which places he tried as a barber. Finally, he returned to Marshfield, in April, 1929, where he has since remained as a clerk and assistant in a furniture and undertaking business. There is naturally some little confusion and uncertainty in the evidence as to the times and periods of his rather numerous changes and in what he did at these various places, but the above outline is as good as can be worked out and is sufficient for the present purpose.

His handicaps; as shown by the evidence most favorable to him, are from the wounded leg, unusual nervousness, trouble with his breathing, and spitting of blood. As to the leg, there is a condition, believed to be necrosis (a dead or diseased condition of bone), which at intervals causes swelling, pain, and emission of pus; he wears a brace to aid in support with a spring to work the foot; he has lost power to lift the toe, and the spring is necessary to work the foot in walking; he limps and is unable to lift heavy weights which throw a burden on his leg. As to nervousness, this is not constant, but recurs and to an extent which seriously interferes with his being a barber. In fact, his leg condition in conjunction with the nervousness might well justify the conclusion that he has been and is unfitted to be a barber. The breath condition is not constant, but at intervals he will have much difficulty in breathing and "smothering spells" which may last an hour or two and are very distressing during that time.

There is conflict in the evidence as to appellee's condition and actions up to his final return to Marshfield in April, 1929. If the matter stopped there we would hesitate, giving him every advantage in the evidence, to say there was no substantial evidence to sustain the verdict because, taking that view of the evidence, it might be said that he had repeatedly tried various ways of making a living and had found himself unable to continue in any of them. But the matter does not stop there. This brings us to the fact which is determinative.

That fact is that for eighteen months before and at the time of trial he had been continuously employed by W. T. McMahan, at Marshfield, as a helper and in general work around his undertaking establishment at a normal wage. The testimony of appellee as to this employment is as follows:

"I went to work in a furniture store, undertaking business for Mr. W. T. McMahan. It is mostly undertaking work. He carries some furniture. It is not a busy place there. My duties there are watching the telephone and clerical work. In case a customer comes in to buy some chairs or something like that, in his line of business, I make the sale. I get up and wait on customers who come in. I am not required to be on my feet very much and in the intervals when not waiting on customers or embalming, I am sitting down.

"You can sit down for embalming a body, that is, outside of getting up for a few things that you need in that line of work. I have been on the job practically steady outside of when I was sick and laying off just from sickness. I have lost maybe a week or so by being off. Over a period of eighteen months. I am required to be at the store at seven o'clock every morning. I am not there at seven every morning. The store is closed usually about 5:00 o'clock. I usually stay until close to 5:00 o'clock. I hardly ever drive the ambulance. I am unable to handle a body alone. * * *

"I am in Marshfield, Missouri, now. I am not in the undertaking business for myself. I am assisting in that kind of work, and I am

a licensed embalmer, and I am doing work under that license. I received $15.00 a week for this work. I have received it only what time I have been off. I have received it for about eighteen months, something like that. * * *

"I testified that while at Marshfield I had worked eighteen months and only been off a week. I had a cot I lay down on and sit down on when I would get to feeling bad, I would lay down and rest. The cot was kept there in the store. I would go home for different times for an hour or two during parts of days."

· The testimony of his wife as to this employment is as follows:

"Mr. Fly is at the present time with Mr. McMahan. Mr. McMahan runs an undertaking and furniture business. Mr. Fly is paid $15.00 a week. About his work, several days he has been off and that all day long. And then there are lots of mornings he just can't get around fast enough. Well, I had better not put it that way, but I noticed the swollen condition of his leg, that he does get to the store late. He stays in the store until five, or a little later. Not every day. Days when he doesn't stay until five he comes to the house and then he has a cot in the back of the store building. I have gone in the store lots of times and found him lying there. * * *

"He has been with the present firm eighteen months. He is now working for Mr. Mc-Mahan. He has not worked constantly during that time. Sickness has kept him confined to his bed about a week during the eighteen months."

The testimony of his employer, W. T. Mc-Mahan, as to this employment is as follows:

"After he left Marshfield, after barbering there, I next saw him probably one and a half years ago, something like that, in 1929, at Marshfield. The circumstances were that I had a letter from Mr. Fly and he wanted work and I wrote him that I had an opening for him, and he came up. I met him at Marshfield. I had a conversation with him about his letter and about his request for employment in the undertaking business. I employed him. The agreement about a salary was $15.00 a week. His duties were as a helper and general work around an undertaking place. I had employed someone prior to the time I employed Mr. Fly. The man that I had before Mr. Fly assisted me around the funeral home. Mr. Fly has assisted me around the funeral home since he has been in my employ. I pay Mr. Fly $15.00 a week. He has been with me about a year and a half. He has been in regular attendance at my Funeral Home. I have paid him every week. He has performed his work there with me satisfactorily. The wages that I have paid Mr. Fly are the usual and ordinary wages paid to a man for the same work that he has done. I have noticed that while Mr. Fly has been with me he has a bad leg, he limps. ·He is quite nervous. I have not noticed anything about his breathing. I have been an undertaker and been in the business for something like thirty years. I have had experience with other undertakers and funeral directors. * * *

"Q. Now, I will get you to state, Mr. Mc-Mahan, if it isn't a fact that right recently you told his wife and, I believe, told me, that his nervousness goes to such an extent that you are afraid to risk him to drive your hearse? A. No, I didn't tell you that.

"Q. Well, what did you tell me? A. I told you that I wouldn't risk him to drive it only in an emergency case, but I didn't say his nervousness went to such an extent.

"Q. Then what did you say? A. That I was afraid to let him drive it.

"Q. And that is a fact, isn't it? A. That I am afraid to, yes, sir."

It is quite evident that appellee has been and is under a considerable handicap because of his condition brought about by his injuries, and is suffering a decided disability which may be permanent. But how can this court say that such disability is total, to the extent that it prevents him from "following continuously any substantially gainful occupation," when the undisputed evidence of the appellee, his wife, and his employer agree that he was at the time of trial and for eighteen months had been steadily employed at normal wages and had, in the words of his employer, "performed his work there with me satisfactorily," with absences of only about a week, caused by sickness? The evident injury to appellee and the highly meritorious service origin of this injury have inclined us to view this record with lively sympathy, but our duty is to take the evidence as we find it and to enforce the rights of these parties as defined by their contract. That contract required total injury before recovery could be lawfully had. This evidence clearly and unmistakably shows no such total injury. The motion for an instructed verdict should have been sustained.

In view of the above determination as to

the sufficiency of the evidence, it is unnecessary to examine the error claimed as to a portion of the charge.

The judgment is reversed and the cause remanded for a new trial.