## UNITED STATES v. GRISWOLD.
### No. 6804.

Circuit Court of Appeals, Ninth Circuit.

Nov. 7, 1932.

George Neuner, U. S. Atty., and Chas. W. Erskine, Asst. U. S. Atty., both of Portland, Or., for the United States.

Allan A. Bynon, of Portland, Or., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

WILBUR, Circuit Judge.

The government appeals from a judgment rendered against it upon a war risk insurance policy where the appellee claimed that he was totally and permanently disabled during the life of the policy, to wit, on August 15, 1919. The only claim made by appellant is that the trial court erred in denying the motion of the government for a directed verdict. The policy expired September 15, 1919. The plaintiff suffers from a falling of the stomach and intestines, causing nausea and weakness. There was testimony to the effect that the condition resulted from an attack of pneumonia while plaintiff was in the military service. The appellant relies upon his work record as establishing the fact that the plaintiff was not totally disabled as early as September, 1919. The statement in appellant's brief on that subject is not seriously questioned and we quote therefrom as follows:

"* * * We gather from plaintiff's testimony on cross-examination that about the first of September 1919 he worked for Mr. Beardsmore. This work was dogging on the carriage in his sawmill, cutting short pine logs. He continued this work for 25 days in September and in October he started oiling, being off from work the last two days in September and four days in October. The work continued through the month of October and into the month of November. He testified that in December he worked in a camp a portion of the time, but not in January at all. In February he drove a team for Mr. Beardsmore, one he had hired, and got paid for the use of the team. He testified that in March he worked 14 days for Mr. Beardsmore under the foremanship of Mr. Dolittle. In April, May and June, he worked for Mr. Beardsmore on river work, working eight hours a day. On July 1, 1920, he was put on another job on a steamboat. Plaintiff testified that this month of May, 1920, with the exception of possibly two months over in Washington in 1928, was the only time since he was discharged from the army that he worked a full month for anyone, except possibly a month or two for the Forest Service. The steamboat work lasted during August and in September 1920, he went back to the camp again. After September, 1920, plaintiff testified that he worked for Mr. Beardsmore again the next spring, working on the river. He was working under Mr. Whetsler and he worked 32 days out of 42 on this job. On June 15, 1921, plaintiff testified that he went to work for the United States Forest Service; that he worked through September 15 of the same year, receiving $100.00 a month as wages; that in September, 1921, he went to the camp of Bert Martin. That in October of 1921, he worked for the Delcano Lumber Company, Camp 4, doing cant

hook work; after quitting work for these people in March, 1921, he went to work for Mr. Beardsmore on the river and worked over forty days and was laid off by Mr. Whetsler. Plaintiff testified that in June, 1922, he went to work for the Forest Service at $100.00 a month and in the fall of 1922 went to work for the Delcano people again, his work consisting of a combination of sledding, skidding and loading; that this work continued until about the first of March, 1923. That in the spring of 1923, he was employed by Victor Pearson at Luck, Washington, working for him about four or five months. That on July 4, 1923, he and his wife's folks contracted to buy a ranch, about 47 acres being in cultivation; that he raised timothy and clover hay to feed the cattle, of which he had about 40 head. That he lived on this ranch from July, 1923 to June 30, 1926, about three years. That while on this ranch he operated a dairy line, having hired help continuously and other help during harvest season; that he helped milk and directed the operation of the ranch; that he left the ranch in June, 1926 and went to the Boise Hospital; that after he left the hospital he was employed in September, 1926, for 18 days as a packer on the forest fire station. That in November, December of 1926, and January of 1927, he worked as a hooker on log rolls for Gus Nickerett, near Priest River, Idaho, earning $4.00 a day; that after January, 1927, he worked 20 days for the Delcano Lumber Company at $4.00 a day on river work. He testified that when he quit the river drive he went to the home of his father-in-law, Frank Dolittle, and stayed there until fall; that he helped in the haying, raised clover and timothy, and looked after some of the milking, receiving no wages while there; that in the fall of 1927 he worked for his brother-in-law loading logs on contract; that this work continued from some time in December until the latter part of February, 1928, and that during this job he was working for wages, however, not much money was received from this contract. He testified that in February and March, 1928, he moved to Ione, Washington, and lived there until he returned from the Veterans' Hospital in Walla Walla; that he left Ione, Washington, having been there from March, 1928, until April, 1929, during which time he worked part of the time on a green chain in a sawmill; that he worked the whole summer, off and on, at this job until the mill shut down, earning $4.50 a day for his work; that after the mill closed down, he worked by contract, the contract

work consisting of repiling lumber; that this contract work ceased in January or February, 1929, and he went to the Walla Walla Hospital; that after coming back from the Hospital he stayed at the home of Frank Dolittle and did very little work since, except the construction of the house at Huntington."

We find, then, that plaintiff admits working twenty-five days in September and twenty-two days in October, 1919, immediately after his policy lapsed.

In view of the fact that the plaintiff did in fact work at a gainful occupation for a long period of time after his policy of war risk insurance lapsed, the case must be reversed [U. S. v. Carrie Bell Lyle (C. C. A.) 54 F.(2d) 357; U. S. v. Harrison (C. C. A.) 49 F.(2d) 227; Nicolay v. U. S. (C. C. A.) 51 F.(2d) 170; U. S. v. Fly (C. C. A.) 58 F.(2d) 217], unless there was substantial evidence that he was unable to do so, or to do so substantially continuously. We will now consider that question.

Dr. Raymond R. Staub, a witness testifying for the plaintiff, after stating the plaintiff's physical condition and the resulting constipation, diarrhea with mucous colitis, testified: "It is a cycling disease. They have a relapse, it will be excited again and they are violently ill." He gave as his opinion that the plaintiff would have relatively short or long intervals of work followed by illness. This testimony seems to be in accord with the plaintiff's work record and the testimony of his relatives, friends, and co-workers, although all testified that during his periods of work he suffered much pain and frequently coughed and vomited. He suffered from loss of sleep due to continuous coughing in the night, and to vomiting. The coughing was a normal result of his bowel condition. Lawrence Trembly, called as a witness for the plaintiff, testified that he worked with the plaintiff in Mr. Beardsmore's sawmill in 1919 for about three weeks. He stated that the work was easy, that the plaintiff seemed ill, that he was sick at his stomach all the time, that he had been sick all the time he was there, and finally fainted as he was dogging the carriage levers; that when they both worked for Mr. Whetsler in 1920 he was sick about half the time. Louis Whetsler, who had known the plaintiff about 47 years, stated that plaintiff was so changed after the war that he hardly knew him and that when plaintiff worked for him in 1920 he was sick nearly every day—coughing and vomiting—but he tried to work. He also testified:

"Different times during this period he would lay off and go home. Other times he would have to get out on the bank of the river and sit down a little while. He would practically fall down, crawl out and lay down a little while; then it would pass away and he would go back to work. I don't know as he exactly complained of anything at this time. The coughs were so severe he would have to lie down on the ground.

"He always tried the best he could to do his work, but he didn't do it the way he should have done it, because he wasn't able to. He had too many sick spells. * * * I put him on out of friendship, to keep him working as much as I could."

Doris Sharbino had known the plaintiff since he was five or six years old. He lived at her hotel for two years, beginning in the fall of 1919 when he returned from the service. She testified:

"I saw him in the fall of 1919—some time in September or October—when he returned from the service. He came to my hotel and for about two years lived at my place. His condition at that time was not very good, for I saw him sick and I have sent for the doctor for him. He coughed so that the guests complained—coughed and vomited. Dr. Carl Gesloff is the doctor I sent for for him.

"He was sick in my hotel at times, because I cleaned his room after him and had to take his meals to him. * * *

"When he'd come back from a job he wouldn't look very good; he'd look sick, and this continued as long as he was there. He didn't get any better.

"I have heard him cough. My apartments were quite a ways away, but I heard him cough and I heard the guests complain. At times I thought I would have to ask him to leave, but I felt sorry for him."

Archie Johnston testified as to his condition in August, 1919, immediately after his discharge, when he stayed for three days with the witness, and later, in October and November, 1930. He said:

"During that time I noticed that Mr. Griswold was not in the best of health. He had several coughing spells and was sick practically all the time he was there—not in bed, but sick off and on.

"The particular thing I noticed was the coughing spells and some vomiting. I do not remember just exactly when the coughing spells would attack him; they occurred both day and night. There was no certain length of time in between. * * *

"I saw Mr. Griswold in my home in Huntington some time in October or November of last year (1930). At that time he was unable to work. I could have gotten him work; I had charge of many men and had a position for him several times.

"He and his wife stayed at my home. He was troubled with sick spells—vomiting and coughing spells, dizziness, and all the symptoms of sickness as near as I can say. I think there was a similarity in the sickness he had then to that in my place in 1919. * * * *"

Mrs. Archie Johnston, plaintiff's sister, testified to the weakness, coughing, and vomiting of the plaintiff in 1919, 1921, and 1929. Norman Dolittle, a brother-in-law of plaintiff, testified concerning plaintiff's ranch work in 1923 and 1924 as follows:

"Hallie Griswold was there and I observed that he was sickly most of the time; couldn't keep up his end of the work. Part of the days he would help and part of the time he wouldn't, depending on how he felt. I saw him coughing and vomiting; sometimes he would be busy and have to leave his work. I noticed when he would attempt to milk the cows he would get dizzy and have to leave the barn and lean against the side of it after he had finished milking a cow. When he didn't feel well, he would go to bed most of the time. He very seldom helped packing in the milk. We had a cart to haul it in. Sometimes when he would stoop over he would almost fall—that is, when he tried to lift up anything that was heavy.

"When he came back from the Walla Walla Hospital I was with my sister and I saw him at that time. There was not much difference in his condition from that of 1920, '23 or '24, only he seemed more nervous and out of sorts. I never saw much difference in the times I have seen him, except that sometimes he appeared worse than others. * * * *"

Sam Dolittle, plaintiff's third cousin by marriage, testified concerning plaintiff's dairy ranch in 1925 and 1926, as follows:

"* * * * During the time I was there I noticed that Griswold was sick all the time.

"The things I noticed were that he was throwing up, and he had dizzy spells, was coughing. I saw him in bed in the daytime, and heard him cough at night time. It seems like he would cough for fifteen minutes at a time.

"He didn't do any work when I was there, except he delivered the milk and did the feeding. He went after the cows several times. He would have fainting spells when he would

go after the cows. It was easier to find the cows than it was to find him. * * * "

Other witnesses testified to the same effect as to the year 1920—in effect that he had always been sick since his discharge; that he lost most of his jobs because of his coughing and vomiting; that he had never had but one month of uninterrupted work since the war. "Up to 1923," he testified, "I did not have any relief from my trouble and distress. The pain all the time was in my side and navel and when I would get excited or anything it seemed to take my breath." He testified that he was able to work about one-third of the time only when he had the dairy ranch and had to dispose of it because he had to hire so much help. He testified that he had worked every day that he could.

Dr. Fouch testified concerning the effect of the physical condition he found, as follows:

"As a result of my examination, my diagnosis was the same as now—that is to say, he was suffering from a complete enteroptosis as the result of pneumonia he had received in France, I believe, in 1919. I mean by that a complete sagging of the abdominal organs, which is a very abnormal condition—to such an extent that all of his intestines are in the bottom of the pelvis and they can go no further.

"The effect of this produces a stasis, or slowing, or obstruction of all food and bowel material, both through the stomach and the intestinal tract, which results in weakening and emaciating him; his being unable to digest food properly, the indigestible food becomes poisonous to him and produces a certain degree of anemia, weakness, and a lot of other symptoms; almost any kind of symptoms traceable to a condition of this kind. They all have to suffer gastric distress; some people call it severe dyspepsia; it is more painful. Vomiting and coughing always accompany this kind of case as a rule.

"Q. What is the exciting cause? A. It works in what we call a vicious cycle. One affects the other. To start with he is nauseated when he takes food, and he coughs because he is nauseated. And this condition produces an acid, or excessive amount, and the lymphatics of the stomach do not produce any digestive juices. The food lays there and ferments, and if it does go through it is improperly digested; it fills him, the patient, with gas. Then they have pain; they want to eat because of the stomach being empty, and after they do eat the stomach does not deliver the food, and they vomit it up. It produces a severe coughing along with the pain. The pain may be anywhere in the abdomen.

"Q. What effect does this sagging or ptosis have upon this man's nervous system? A. Put him under a constant nervous strain, on account of pain and distress. I believe this condition is a permanent one, because there has never been any cure for it. I don't believe it is possible for him to carry on continuously a substantially gainful occupation because he is in constant pain and agony, and he is apt to vomit at any time, whether there is food in his stomach or whether it is empty.

"The position of these organs has some effect upon the bile, because instead of the bile draining through the intestinal tract as it otherwise would, the stomach sags and the bile drains down into the stomach instead of the intestines and this causes him to vomit.

"I don't see how the plaintiff would be able to work, because he cannot retain enough food to maintain his strength and it is too painful. This condition is a permanent one; I have not known of a case being cured, and believe he has been unable to continuously follow a substantially gainful occupation ever since the date of his convalescence following pneumonia."

At the argument we were impressed that the case was controlled by the above-cited cases, but a study of the briefs and record convinces us that there was substantial evidence to go to the jury upon the proposition that although plaintiff actually worked for long periods of time, he was not then able to do so nor to do so continuously, and that the case is ruled by our decisions in U. S. v. Sligh, 31 F.(2d) 735; U. S. v. Meserve, 44 F.(2d) 549; U. S. v. Rasar, 45 F.(2d) 545.

Judgment affirmed.