180

## UNITED STATES v. CORNELL.
### No. 9593.

Circuit Court of Appeals, Eighth Circuit.
Jan. 14, 1933.

F. H. Wagener, Atty., Veterans' Administration, of Lincoln, Neb. (Charles E. Sandall, U. S. Atty., and Ambrose C. Epperson, Asst. U. S. Atty., both of Omaha, Neb., Robert Van Pelt, Asst. U. S. Atty., of Lincoln, Neb., and Edson Smith, Asst. U. S. Atty., and Lawrence I. Shaw, Asst. U. S. Atty., both of Omaha, Neb., on the brief), for the United States.

Carl T. Self, of Omaha, Neb., for appellee.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

KENYON, Circuit Judge.

This is an appeal from a judgment in favor of appellee on a war risk insurance policy. Appellee will be designated as plaintiff; appellant as defendant. The only error assigned is the action of the court in overruling defendant's motion for a directed verdict made at the close of all the evidence.

Plaintiff enlisted in the Army of the United States in June, 1918, and was honorably discharged therefrom August 16, 1919.

The instructions of the court are not in the record, but plaintiff seems to have rested his case on the proposition that he was totally and permanently disabled at the time of his discharge August 16, 1919, although the contract of insurance did not lapse until January 1, 1923.

Our inquiry here is whether the jury's verdict of total and permanent disability at the date of his discharge is based on substantial evidence. The burden was upon plaintiff to establish total, permanent disability while the policy was in effect. Blair v. United States (C. C. A. 8) 47 F.(2d) 109; United States v. Le Duc (C. C. A. 8) 48 F.(2d) 789; Eggen v. United States (C. C. A. 8) 58 F.(2d) 616.

In considering the question before us, the evidence introduced by plaintiff is entitled to the most favorable consideration that can fairly be accorded it.

In the natural sympathy which all feel for disabled soldiers there is a humane tendency to regard this war risk insurance as in the nature of a bounty from a grateful gov-

ernment, but it is not, and these policies of insurance are contracts, and must be so dealt with.

The courts have quite generally adopted the definition of the Treasury Department that total disability is "any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation." United States v. Perry (C. C. A. 8) 55 F.(2d) 819, 821; United States v. Harth (C. C. A. 8) 61 F.(2d) 541; Eggen v. United States (C. C. A.) 58 F.(2d) 616, where the recent cases are quite fully cited.

Of course, the total disability must become permanent before the policy lapses. Permanency developing thereafter cannot resurrect a dead policy. The terms of this definition have been given a rational and reasonable interpretation by the courts, for difficulties arise in any literal interpretation of some of the words or phrases employed, such as the words "impossible," "continuously," and the term "any substantially gainful occupation." In Nicolay v. United States (C. C. A. 10) 51 F.(2d) 170, 173, the court, referring to the use of the word "impossible," said "it cannot fairly be said that it is 'possible' for an insured to work because, under the stimulus of a strong will power, it is physically possible for him to stick to a task, if the work is done at the risk of substantially aggravating his condition." See Barksdale v. United States (C. C. A. 10) 46 F.(2d) 762; United States v. Perry (C. C. A. 8) 55 F.(2d) 819; United States v. McGill (C. C. A. 8) 56 F.(2d) 522. In United States v. Fly (C. C. A. 8) 58 F.(2d) 217, Judge Stone uses the phrase "inability to follow continuously," etc., instead of "impossible to follow continuously," etc., which perhaps is more accurate.

The word "continuously" as used in the definition of total disability is generally construed to mean with reasonable regularity in contradistinction to spasmodically following a gainful occupation. Spasmodically is not continuously. Ford v. United States (C. C. A. 1) 44 F.(2d) 754; Carter v. United States (C. C. A. 4) 49 F.(2d) 221; White et al. v. United States (C. C. A. 5) 53 F.(2d) 565; United States v. Perry (C. C. A. 8) 55 F.(2d) 819; United States v. Peet (C. C. A. 10) 59 F.(2d) 728; United States v. Harth (C. C. A. 8) 61 F.(2d) 541.

"Substantially gainful occupation" as used in the definition means any occupation for which insured is by nature fitted or competent to follow which will enable him ordinarily to make a living for himself. Barksdale v. United States, supra; United States v. Perry, supra. The performing of some work does not in itself show that a party was not totally disabled. The test is the ability to work without serious peril to the life or health, or as said in United States v. Harth, supra, at page 544 of 61 F.(2d), "without the risk of substantially aggravating the ailment with which he is afflicted." United States v. Eliasson (C. C. A. 9) 20 F.(2d) 821; United States v. Phillips (C. C. A. 8) 44 F.(2d) 689; United States v. Rasar (C. C. A. 9) 45 F.(2d) 545; Sorvik v. United States (C. C. A. 9) 52 F.(2d) 406; United States v. Perry (C. C. A. 8) 55 F.(2d) 819.

Total disability is permanent if conditions are such that there is a reasonable certainty of its continuing throughout sufferer's life. Eggen v. United States, supra.

With these general legal principles in mind we turn to the evidence. On November 1, 1918, plaintiff, while serving in the United States Army in France, suffered a severe shrapnel wound on his left shoulder. The wound was a penetrating one from the base of the neck on the left side of the seventh cervical and dorsal vertebræ. His wound broke open after he got home, and the same discharged pus and was sore and feverish for some time. He had more or less trouble with it, and there were a number of operations between August 16, 1919, and 1932. The first one was serious, the last a minor affair. All were in connection with the wound. Dr. Wagener operated on him the first time. Thereafter Dr. Henry performed the operations. He was the main medical witness for plaintiff, and testified in part as follows:

"I treated him at that time from August, 1920 to May 1, 1921. His history as given to me was that he received this wound in one of the battles in France, the shrapnel went in one side of his neck and came out his back; he was treated on the battlefield and it apparently healed until this time but was always more or less sore and gave him more or less trouble; then it became acutely inflamed and required a further operation.

"I have here a record of seven operations and they would vary. He would be in the hospital from three or four days to two or three weeks each time depending on the severity of the infection at that time.

"The first operation was August 12, 1920, and the last one was January 3, 1930, that is ten years. * * *

"There was always more or less sluffing off of the bone. That is what we call osteomyelitis. That condition was not there every time, possibly half of the time there would be a sluffing of the bone. It would have to be scraped off or chiseled off or taken out in some way. The shrapnel apparently were in this point (indicating the top shoulder wound) and of course he had his clothing on and it shot the clothing through a part of it and it came back in there (indicating the back wound) and it was my job to get a piece of the clothing or a piece of a bullet or dead bone that had sluffed off as a result of the infection out of the wound, and I had actually picked out some pieces of the clothing and pieces of bone out of this wound during those operations. * * *

"Sometimes we would have to put him in the hospital for two or three weeks and sometimes there would be a month or two he could do light work.

"He has been sick off and on and then he would have spells off and on and then have a month or two when he would be pretty well and then he would go back to his work but I never would say he was a well man but is a man that will have to watch his corners. He will never be like he was before he had this wound.

"He is not able to do heavy work, heavy lifting with his arms and the like of that. I don't think he ever will be able to do that. * * *

"The reason I can't be sure about this boy is that when bone once becomes infected some times for four or five years it will be dormant and then break out again. Now, the X-rays do not show anything at all and that was because we would find a little piece of bullet behind the bone. We feel now that the boy is pretty well but I have thought that for ten years and he keeps coming back and I have to open that up and take another piece out. There is a cord there and he is living on a little crater and I don't know when the thing will break out again, and all he can do is go to the doctor every time it opens up, and that is a thing that is facing this boy for awhile I am afraid.

"There is a possibility that this wound in the vicinity of the spinal cord would affect his nervous system in some way. If there should be a little inflammation, the hole that the cord goes down is about that relative size (illustrating). Now if the bone would thicken and throw off the pus, it is likely to pinch the cord itself and he would be completely paralyzed from here on down and that would be quickly recognized and we could go in there and get that out—that is one of the things we have to watch for at all times, that that callous will not pinch the spinal cord and this side would be then paralyzed."

He further testified:

"He was treated by me for the following periods: August 12, 1920 to May 21, 1921. August 19, 1921 to November 25, 1921. July 10, 1923 to December 1, 1923. January 18, 1925 to May 1, 1925. October 3, 1925 to December 15, 1925. October 10, 1928 to March 1, 1929. January 3, 1930 to February 10, 1930. I have not treated this man's wound since February 10, 1930. His scar has remained healed since February 10, 1930.

"During the following periods I did not treat this man and the wounds were healed: May 21, 1921 to August 19, 1921. November 25, 1921 to July 10, 1923. December 1, 1923 to January 18, 1925. May 1, 1925 to October 3, 1925. December 15, 1925 to October 10, 1928. March 1, 1929 to January 3, 1930. * * *

"The last operation was nothing like so serious as the first operation. The last operation was a very minor affair. Just something came to the surface and all I had to do was open it up and take it out and pack it. The first operation was a very serious one.

"The operations which I have performed on this man have grown less severe with each succeeding operation. During the times that I was treating him he could have followed some light occupation continuously. * * *

"During the times in which the wound was healed and when he was not getting treatment from me, he could do light work. He might not be as full of pep and might not be able to do as much work but he could do light work. I have not seen him about his wound since February 10, 1930. * * *

"I don't think many men can have such a severe injury and ever be up to normal. It always reduces his vitality, his ability to keep up with the battle of life to a greater or less extent. He gets the little diseases going around very easily and that is probably due to the lowered vitality. As long as it is healed as well as it is now I don't think that exercise hurts it particularly. I don't think he has the strength or vitality to do heavy work, but up to the limit of his capacity I don't think that work will hurt him a bit."

The evidence shows that plaintiff worked for a continuous eleven-month period in 1919 and 1920 for a Mr. Walker in his cleaning plant, receiving $25 per week most of the

time. For nine weeks of the time he received $27.50 per week. One week in July, 1920, he did not work. One week he received only $4.60, and one week $8.35. He and his wife testify he worked with difficulty. Mr. Walker testified that "full value was received for his work"; that "he appeared for work regularly and was very competent, and was decidedly responsible." At the time of his examination for compensation he made this statement: "Did practically no work for about two years after discharge on account of my physical condition. Then started to work in a Dry Cleaning Shop and was so employed until about in 1922. Wages $35 per week. Then started a Dry Cleaning Establishment of my own and have been so engaged ever since." He and his wife conducted a dry cleaning establishment after he worked for Walker and carried it on from 1922 to time of trial. He received vocational training while working for Walker. When he left the service, he had practically lost the use of his right eye, and is permanently blind in said eye. Dr. Holst testified as to the condition of plaintiff's eye and that there was no cure therefor; that it was completely atrophied; that there were occupations which the loss of sight in this eye would make it impossible for him to follow; and that it was a serious handicap. The record is not clear as to just when this eye condition commenced.

That this man suffered serious injury in the war cannot be gainsaid. With the wound in his back and the loss of the sight of one eye it is apparent that he was considerably disabled, and that such disability was permanent.

The case of United States v. Fly, supra, is very much like this one. Fly suffered a bone, wound which emitted pus, and caused pain and fever, as here. His nervousness there, as here, was marked and interfered with his chosen occupation. He was, as here, periodically incapacitated. This court said at page 219 of 58 F.(2d): "It is quite evident that appellee has been and is under a considerable handicap because of his condition brought about by his injuries, and is suffering a decided disability which may be permanent. But how can this court say that such disability is total, to the extent that it prevents him from 'following continuously any substantially gainful occupation,' when the undisputed evidence of the appellee, his wife, and his employer agree that he was at the time of trial and for eighteen months had been steadily employed at normal wages and had, in the words of his employer, 'performed his work there with me satisfactorily,' with absences of only about a week, caused by sickness? The evident injury to apellee and the highly meritorious service origin of this injury have inclined us to view this record with lively sympathy, but our duty is to take the evidence as we find it and to enforce the rights of these parties as defined by their contract. That contract required total injury before recovery could be lawfully had. This evidence clearly and unmistakably shows no such total injury. The motion for an instructed verdict should have been sustained."

The statement of plaintiff's doctor, E. C. Henry, "During the times that I was treating him he could have followed some light occupation continuously," is most significant. The evidence shows he could not do heavy work, but a gainful occupation might have consisted of light work, and such his doctor says he could do continuously. There is no evidence that the light occupation which Dr. Henry says he could carry on continuously was not a gainful occupation, and the evidence shows he worked for Mr. Walker in his cleaning plant in 1919 and 1920 for a continuous period of practically eleven months, for which he received $25 and $27.50 per week most of the time, and thereafter carried on, or assisted in carrying on, a dry cleaning establishment. Dr. Henry did not testify that he was permanently and totally disabled at any time during the ten years he had him under his care, nor does any other doctor so testify. Dr. Henry's evidence is convincing more for what he carefully refrains from saying than for what he actually does say. If plaintiff could continuously carry on a light, gainful occupation he would not be totally disabled. Under Dr. Henry's evidence, he could carry on a light occupation. The burden, however, was on plaintiff to show that said occupation was not a gainful one, and there is no substantial evidence in the record to show it was not gainful.

The case was tried and submitted to the jury, on the theory of total and permanent disability on August 16, 1919, while the payments on the policy carried it to 1923. The record does not advise us why the case was not tried on the theory of total disability just prior to the lapsing of the policy. Our conclusion is that plaintiff's evidence failed to establish that his disability was total at the time of his discharge, and that question is left in the realm of speculation and conjecture. The motion of the government for a directed verdict should have been sustained. There is

nothing for us to do but to set aside the judgment and remand the case for another trial.

Reversed and remanded.