## DUPUIS v. UNITED STATES.
### No. 4955.

District Court, D. Massachusetts.
Sept. 21, 1933.

Thomas P. Shea, of Springfield, Mass., for plaintiff.

Frederick H. Tarr, U. S. Atty (by J. Duke Smith, Sp. Asst. to U. S. Atty.), both of Boston, Mass., for the United States.

BREWSTER, District Judge.

This petition is brought to secure the benefits of a contract of war risk insurance for $5,000 which was in force from January 25, 1918, to January 30, 1921. The petitioner claims that he became totally and permanently disabled on July 20, 1918, when he was wounded while participating in the drive near Soissons, France. On that day he was rescuing an officer who had been wounded, and while carrying him from the field he was struck in the shoulder by a piece of shell and severely wounded. He was given first-aid treatment and then taken to the field hospital, and on the 22d day of July the first operation was performed at the Red Cross Hospital at Neuilly. He was hospitalized in France and in this country until January, 1921, when, at the Walter Reed Hospital, it

was thought that his wound had healed, and while waiting for his discharge it "broke down again," and his discharge was delayed until March 4, 1921, when he was discharged as unfit for duty. During this period of hospitalization, both in France and in the United States, he underwent numerous operations—so many, in fact, that the petitioner was unable to give the total number of them. He entered upon vocational training in 1921, first in bookkeeping and then in architectural drafting. With interruptions, due to illness, he continued vocational training until 1924. In August, 1924, he entered upon placement training and continued until April, 1925. In October, 1924, while still in placement training, he was in the construction department of H. L. Doherty Company, when he was taken ill and was in a hospital where he submitted to a tonsil operation. When he had sufficiently recovered to return to work, there was no opening for him and, according to the records of the Veterans' Bureau, training was discontinued because he had failed to avail himself of it. He thereupon entered a summer camp during the summer of 1925. During his placement training he received no salary but received compensation from the government. After he was discharged from training, he had no remunerative employment except five or six weeks in 1926 when he was with the Bosch Magneto Company, and again in 1929 when he worked a few weeks in a hotel. He was obliged, in both instances, to give up employment on account of physical ailments which, while not directly connected with his wound, were undoubtedly induced by a run-down condition which might be traceable to his wound and his hospital experiences. He did make a further attempt to earn a livelihood by taking a short training in poultry raising, but nothing came of it.

We have here a case where there is no evidence of gainful employment with substantial regularity. The evidence leaves no doubt that the petitioner sustained a temporary total disability, but whether the totality of the disability can be said to be permanent within the accepted definition of "permanent disability" is the real question presented. Under the contract a "permanent disability" is one founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it. The government did not insure against total temporary disability or partial permanent disability.

While the circumstances of his service injury are bound to excite sympathy, the duty

of the court is clearly to determine the rights of the parties under the contract of insurance. The petitioner, in order to recover, must establish the fact that his injury, received during the war, rendered him unable to carry on a substantially gainful occupation, not only at the time of the injury but at all times since then and that it is reasonably certain that such total disability will continue.

■ The fact that petitioner has not carried on a substantially gainful occupation, while furnishing in this case strong evidence of his inability to do so, is not conclusive. Hobin v. United States (D. C.) 59 F.(2d) 224; Hanagan v. United States (C. C. A.) 57 F.(2d) 860.

■ It is necessary to weigh with some degree of care the medical testimony relating to the character of his wound, the diagnosis of subsequent physical conditions, and the prognosis.

As to the character of his wound, it appears that when he was injured a piece of the shell punctured and fractured the shoulder blade, and he was treated for a compound comminuted fracture of scapula and upper third of humerus. Osteomyelitis and necrosis followed, necessitating many operations upon the shoulder until it has been cut away to such an extent that only scarred tissue covers the bone. All the muscles and flesh over the shoulder blade have been removed during the course of the many operations. There is a complete ankylosis of the humerus to the scapula. Blood vessels must have been destroyed in the original injury, and nerves in the brachial plexus were then injured. The brachial plexus is practically the whole nerve supply to the arm, which would mean that the veteran would suffer referred pain at his elbows and the tips of his fingers.

From the time of the injury up to November, 1932, there has been a periodical breaking down of the wound. The word "breakdown," according to medical testimony, means a "pustular formation with pus and serum coming out," which indicates active osteomyelitis at the time of the breaking down. An X-ray taken late in 1932 showed a sequestration, or piece of the detached bone, in the shoulder. Very little nutrition is supplied the bone.

In addition to the intermittent breaking down, which in some instances required operations and in others short periods of hospitalization, the petitioner is subject more or less to pain in his shoulder and forearm, and if he uses his right arm continuously it becomes numb. When writing, he has frequently to stop to rub the hand and forearm. He writes with some difficulty, but, notwithstanding his handicap, is able to write legibly. He has no organic disease and, although not robust in appearance, is apparently a healthy individual except for the infirmities resulting from his service injury.

According to the testimony of the psychiatrist, he found, as a result of his neurological examination, that:

"The cranial nerves were O. K. Cutaneous surfaces throughout the entire right shoulder girdle are very sensitive to pin pricks. No other objective disturbance in sensation. Vasamotor tone is reduced. Much atrophy of muscles comprising the right shoulder girdle, but particularly the deltoid which is practically gone; is but a vestige of its former self. Some of the atrophy of the muscles in the right shoulder girdle are, no doubt, atrophied from disuse, but the deltoid seemingly is the residual not only of the injury, but, also, paralysis of the right circumflex nerve. Right hand is quite weak, and movements of right arm are more or less clumsy, no evidence of any involvement of the right musculospiral nerve. There is loss of motion in the right upper extremity, especially in shoulder. Superficial reflexes are present, equal, lively."

His diagnosis was complete paralysis of circumflex nerve, post traumatic.

The medical experts were not fully agreed as to the resultant osteomyelitis. One view was that petitioner was suffering from chronic osteomyelitis; another that the evidence showed only healed acute osteomyelitis. As I understand the medical testimony, it supports the latter diagnosis. The attacks have been occurring with less frequency and less severity as time passes, and there is a reasonable probability that they will cease to occur at all.

This court has decided, in Hobin v. United States, supra, that the loss of one arm does not totally disable an otherwise healthy individual, and this in a case where the evidence disclosed no continuous period of gainful occupation. Petitioner would distinguish the case at bar by pointing to the testimony of his doctor, who stated that, in his opinion, Dupuis was "more disabled than he would be if he had no right arm." This opinion was apparently based upon the statement of the petitioner that he still suffered pain in his shoulder and arm and the possibility of the recurrence of the osteomyelitis. The government's experts, on the other hand, testified

that his disability was less than it would have been if his arm had been amputated at the shoulder. My opinion on this aspect of the case coincides with that of the government witnesses. The right hand and forearm still function and are far from useless. His handicap undoubtedly will tend to limit the field of gainful occupation which he may pursue, but such field is by no means closed to him. He may not be able to do work which would put a heavy strain on his right shoulder or which would require constant use of his right hand. But petitioner had a fair education, is intelligent and of good appearance, and, aside from his wound and its effects, he is healthy. His writing is easily read, and his period of training in architectural drawing evidences his capacity to make use of the injured member.

I can see no grounds upon which the case can be distinguished from Hobin v. United States, supra. That case seems to be in harmony with decisions in other circuits involving the loss of a limb. See United States v. Thomas (C. C. A.) 53 F.(2d) 192; United States v. Ivey (C. C. A.) 64 F.(2d) 653; Hanagan v. United States, supra; United States v. Cornell (C. C. A.) 63 F.(2d) 180; United States v. Mayfield (C. C. A.) 64 F. (2d) 214; United States v. Harris, 66 F.(2d) 71 (C. C. A. 4th Circuit) June 24, 1933.

Defendant's motion for a judgment is allowed.