## UNITED STATES v. GREEN.

No. 9489.

Circuit Court of Appeals, Eighth Circuit.

March 5, 1934.

V. E. Willis, Chief Atty., U. S. Veterans' Administration, of Kansas City, Mo. (William L. Vandeventer, U. S. Atty., and Claude E. Curtis, Asst. U. S. Atty., both of Kansas City, Mo., on the brief), for appellant.

Platt Hubbell, of Trenton, Mo., for appellee.

Before STONE and KENYON, Circuit Judges, and REEVES, District Judge.

STONE, Circuit Judge.

The statute creating war risk insurance (40 Stat. 398, 409) provides for insurance against death or "total permanent disability." This insurance was voluntary and a matter of contract. It was in force during the life of the contract (the policy). Therefore, to entitle to recovery thereunder the insured must (where death is not involved) establish "total permanent disability" during the life of the contract [Lumbra v. United States (January 8, 1934) 54 S. Ct. 272, 78 L. Ed. —]; and, in this court [United States v. Cornell, 63 F.(2d) 180; United States v. Peters, 62 F.(2d) 977, 978; United States v. Harth, 61 F.(2d) 541, 543]. Whether a claimed disability was "total permanent" and was such during the life of the contract are questions of fact. The initial determination of these fact questions is placed by the statute (40 Stat. 398, 410) in the bureau of war risk insurance with provision for judicial determination in case of disagreement in the bureau. To aid the bureau in performing its duties, the statute (40 Stat. 398, 399) authorized the director of the

bureau to make rules and regulations covering various matters including "the nature and extent of the proofs and evidence * * * to establish the right to benefits of * * * insurance provided for in this Act." In pursuance of that power and to define the meaning of the terms "total" and "permanent" (as applied to disability), the director ruled (T. D. 20 W. R.) that "any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed * * * to be total disability. Total disability shall be deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it." While "the above-quoted administrative decision is not, and manifestly was not intended to be, an exact definition of total permanent disability or the sole guide by which that expression is to be construed" (Lumbra v. United States, 54 S. Ct. 272, 276, 78 L. Ed. —, decided January 8, 1934), and while such definition is, obviously, not binding upon courts, yet it has been found useful and has influenced many decisions on this character of insurance. In the Lumbra Case, supra, it is well said: "The various meanings inhering in the phrase make impossible the ascertainment of any fixed rules or formulæ uniformly to govern its construction." About all that can be said is that the phrase is "to be construed reasonably and having regard to the circumstances of each case," remembering that "'total disability' does not mean helplessness or complete disability, but it includes more than that which is partial" and "'permanent disability' means that which is continuing as opposed to what is temporary. Separate and distinct periods of temporary disability do not constitute that which is permanent" (Lumbra Case).

■ The experience of the courts in considering "the circumstances of each case" has developed that certain lines of evidence are, from their very nature, nearly always present and are important. One of these is the character of disability when considered in connection with the individuality of the person disabled. The disability may be of a character (violent insanity for example) which would "totally" disable any person, regardless of differences in individuality. Often, however, the disability is of a kind that its extent depends more largely upon the individuality than upon the character of the disability. Thus the loss of both legs might totally disable a common laborer with slight education and with little stamina and initiative while it would have relatively slight effect upon the earning capacity of a college teacher. Thus the individuality of a claimant may be an important and even a controlling element in the circumstances of his particular case. Another line of evidence has to do with the claimant's condition after the lapse of the contract. While such evidence "may be considered only for the purpose of determining his condition while the contract was in force" (Lumbra Case), it, obviously, has a direct bearing upon the permanency of the injury and often upon the totality at the time of the lapse. In consideration of this character of evidence, it is necessary to bear in mind that conditions which may have existed during the contract may be only earlier stages of some ailment which progressively grows worse until after lapse of the contract it causes, for the first time, total and permanent disability. Thus it not infrequently happens that a total permanent disability clearly shown to exist at the time of trial became such only after, sometimes long after, the contract lapsed.

■ With the above general observations in mind, we consider the evidence here as to the circumstances of this particular claimant. This evidence shows that appellant was a healthy, strong young farm hand when he volunteered in June, 1917. His educational qualifications are not shown. He was a man of character who wanted to do a man's part. In April, 1918, he was severely injured while he and other soldiers were carrying a heavy pontoon bridge boat. Some of the other men released their support resulting in the weight of the boat, unexpectedly, crushing him to the ground. The boat was lifted from him and he was taken to the company doctor who examined him but lacked X-ray equipment to ascertain the extent of injury. He recognized that appellant was severely injured but diagnosed merely as "traumatism" and thought the injury would last several years. He taped the body and appellant was confined to his tent for about three weeks during much of which he was lying down. At first, he was unable to stand but became better. After he recovered so as to leave the tent, he was unable to do the heavy work required of the engineers regiment (to which he was attached). Therefore, he was transferred (over his protest) to the headquarters regiment, where the work was lighter. His history after leaving his tent and up to his discharge from the army, in June, 1919, is as

shown in the footnote[1]. After his discharge from the army, he worked for Mason Brown. Thereafter, he tried farming on several farms —successively the Pipol farm (1920–1921), the Johnson farm (1922–1924), the Coleman farm (1925), and the Conservative farm

1 1. Going back to Deming, guard duty, etc.

Plaintiff's testimony: From Camp Courchesne, they went to Deming, N. M. He tried to walk, but, after going about a mile, had to fall out and an ambulance hauled him the rest of the way. When he got back to Deming, he rested. They made a hike to Gila Forest, and left three or four of them to guard the camp. In guarding camp, they only had to walk around the camp with a club in their hands, there being no work to do. On cross-examination, he testified: He stayed two or three months at Deming before crossing the water, during which time he was not in the hospital but with his company. He did a little guard duty while the company was on the above hike, after which he was transferred to headquarters. While on guard duty, he walked his beat and was only on every other day.

Testimony of Carlson (his captain): He went back to duty but was later transferred to the headquarters company because I thought he was not able to act as a combatant soldier. I compelled him to go back to duty under the belief that possibly he was not as seriously injured as his complaints would indicate. After being assigned back to duty, he frequently complained of inability to march, carry a rifle, and perform other duties assigned to him, and he was transferred to headquarters. I left the company in July, 1918, and had not seen him since. I did not ascertain the extent of his injury. He continually came to me asking to be made a waggoner so that he would not have to carry a pack and rifle. Did not remember any occasions where he broke from ranks and had to be assisted. He complained to me of pain, but I did not remember what part of his body these pains seemed to be present—he "was usually sick all over." He complained as long as he was in the company. On cross-examination, he testified: He returned to duty with the company after several days but did not carry on as well as he had before the injury. He constantly complained he could not do the tasks assigned to him as a soldier, but performed the duty even though he would complain. He performed his duties as well as before, with the exception that he possibly complained more than he did before the injury.

2. Transfer to Headquarters.

Plaintiff's testimony: After the company came back from the hike, he was ordered to headquarters where they issued rations, and through which they had to go to draw their horses and equipment. He was transferred to the mounted section at headquarters, riding a horse, and was there about two weeks, riding the horse about three times for an hour each time. His back was so weak and pained that he could not stand riding a horse. Next, he was made a waggoner, his duties being to haul provisions and clean up around the camp. He had four mules, but he always had a man with him to do all the loading and unloading, and all he did was drive the mules, which he did for about two months at Deming. On cross-examination, he testified: He rode the horse about three or four times in two weeks for about an hour each time. They were drilling. After that, he was made a waggoner and handled four mules. He was the driver and the man with him helped take care of the mules, and hitched and unhitched. All the waggoners had assistants, and he and some of the others hitched up every other day and others hitched up every day.

3. Overseas Service and Discharge.

By plaintiff: They sailed from New York and landed in Liverpool in September, 1918, and then went to Cherbourg and then to Mesves Hospital, where he was stationed until January, 1919, and then went to La Guerche, France. When the Armistice was signed, he was in the above-named hospital, and, from the time he landed until the Armistice was signed, he never did anything except a little K. P. work and a little guard work, K. P. work being kitchen work, and the guard work being merely guarding the camp. He was on this guard duty only about a week. He was on every day and every other night, two hours on and two hours off, and he did no physical work except the above. His back pained him all the time and he had no strength in it and he could not pick up anything or try to do any work. He stayed in the Army because he hoped he would recover so he would be all right when he got out. When they got to Mesves, a big hospital was being built and they were in the construction work, the teams and wagons being assigned to haul material, but he did not drive any teams or haul any material himself. He was assigned to watch the teams in the camps and see that they were not abused by the men and that the men did not quit before quitting time. He was watching the teams after the Armistice and did this up until January, when he went to La Guerche. It was there that he did the

(1926–1927). The testimony as to these operations is as in footnote [2].

After leaving the last above farm, he moved to Gallatin, Mo., where he attempted some light work and then went to Winston, Mo., where he attempted to operate a res-

M. P. duty, being on duty every other day and every other night. They then assembled to come home, and he landed in New York, in June, 1919. From there, he went to Camp Dodge, Iowa, where he was discharged. He said his physical condition was good when he was discharged because he thought it was, he having never done any hard work to find out when the doctors told him it was good.

On cross-examination, he testified: During the time he was at Mesves Hospital Center, he watched the teamsters, four of them being assigned to check up and watch the horses, and the rest being put to driving trucks. They were assigned to watch the drivers, to prevent abuse of the horses, and unhitching before time, and they went in the morning and stayed all day. They had nothing to do with the condition of the stock but were a kind of overseer. He did that about three weeks, and had a little M. P. duty in which he had to watch the camp. He worked his two days on and four days off the same as the rest of the men on guard duty for a week or two. After that, he never did anything. He was on K. P. once, and, in that respect, he worked with the other men.

[2] 1. Working for Mason Brown.

Plaintiff's testimony: After being discharged, he went to Pender, Neb., and went to work on a threshing machine for Mason Brown, in 1919. He started in hauling water for Brown, but got so he could not haul it, because his back was so weak and the pain so bad he could not stand up on the tank car. His neighbors and friends were filling up his wagon for him out of their supply tank. His back was so weak he could not lift a barrel used in supplying the thresher with water, and Brown lifted it for him a time or two and the neighbors did it several times. For the same reason, he could not work the pump to supply water to the wagon tank, and that was the reason his neighbors let him have water out of their supply tanks. After three weeks, he could not haul the water, and they had to quit because they could not get any one else to haul it. The next work he tried to do was shuck corn that fall for Brown, but, after two weeks, his back hurt so he could do it no longer. He laid off a few weeks and went back again, but, after picking a load of corn, had to quit again. Brown then gave him a job doing chores and his wife did the cooking until March, 1920, for their board.

On cross-examination, he testified: He hauled water for the threshing machine for about three weeks, and was paid $5 a day. He worked only three or four days a week while threshing, the others working sometimes when he was not able to haul the water. They did not have any other water hauler. He supposed he made about $30 a week during these three weeks. He worked until he could not haul water any more and then they quit. They started in threshing in July and quit in the forepart of August. They did not finish threshing because they had no water hauler. After they quit threshing, he never did anything except help with chores. In October, he hired out as a corn shucker, but did not shuck corn but two or three days and then had to quit. He was paid 10 cents a bushel for shucking and could only shuck about 40 bushels a day whereas, before going to the Army, he could shuck 70. He stayed with Brown until March, 1920, and Brown had other men there shucking corn nearly all winter, and he went back and tried to shuck but could only shuck one load.

Charles E. Baker: Saw plaintiff the day he came back from the Army, and he did not notice much change in plaintiff's condition. Saw him when he was hauling water for Brown in the fall of 1919 and observed the manner of his work and his condition at that time. He did not seem to be feeling well and did not have the same rugged appearance he had before entering the Army.

Mason Brown: Plaintiff went to work for him and his brother on the thresher, hauling water, after coming back from the Army, in 1919. He was not stout and could not pick things up and throw them around like any stout man could. He complained of his back and could not lift a wooden water barrel up on the tank wagon, and Brown would throw it up for him. When he tried to lift it up on the wagon, it seemed as though it hurt him. Claimed his back hurt him when he took hold of anything. If he took hold of anything "you could tell he was kind of knocked out." Brown threw the barrel on the wagon for him lots of times. Brown hired him in 1919 to shuck some corn and he shucked a little and came in. He would get up in the morning and say he did not believe he could work because his back hurt. Then, he would probably lie around a day or two and try it again. He probably shucked 300 or 400 bushels. When he started the second time in 1919,

he shucked a day or a half a day. Did not get around like he did before he went to the Army. He was lively before and "just draggy" afterwards—he slowed down and could not move around like he did. Brown could see he was not like he was. He did not finish shucking corn for Brown in 1919, but Brown hired some one else to do it. He did a few chores and light work around the house. He left Brown's place in 1920 and went to farming with his brother, and thereafter, when Brown saw him, he noticed no difference, he being the same as he was when he was at Brown's place. On cross-examination, Brown testified that he did not have much opportunity of seeing him after he left his place but just met him around town and on his place. Brown could not say that he had ever seen him at work on his own farm.

Mrs. Gertrude Green, plaintiff's wife, testified that, after they were married (October, 1919), they worked for Mason Brown, he shucking corn and she working on the farm.

2. Pipol Farm (1920 and 1921).

Plaintiff's testimony: In March, 1920, he leased the 160-acre Pipol farm. He never did a whole lot on the farm. He tried to sow oats and do some hauling but his back prevented. He did about a third of a man's work and was "laid up" with his back the other two-thirds of the time. His brother plowed 40 acres for him and planted some of the corn, and his wife cultivated quite a bit of it. His wife worked in the field as a hand, and he had to have all his corn shucked. He farmed the same place in 1921, he having leased it for two years, his brother coming down and helping him cut, thresh, and haul his oats, and his wife going out in the field to help him cultivate. He used a riding cultivator and it hurt his back, and, generally speaking, he had the same experience in 1921 as in 1920. On cross-examination, he testified, in part, as follows: His brother stayed with him and his wife the biggest part of the time on the Pipol farm. His brother helped put in all his crops, cut his oats, thresh and haul them. His brother, after helping him with his crop, worked for some other person. With the money he had and some he had borrowed, he stocked and equipped the Pipol farm. He went into the farming business there, put in around 70 or 75 acres of corn, and 30 or 40 acres of oats. He tried to do all kinds of farm work while on the farm—plowing, corn shucking, oat cultivating and cutting—but he could not do it. He harvested 1,200 or 1,400 bushels of corn out of the 70 acres. He did not have a very good crop of oats, something like 400 or 500 bushels off of 60 acres. Just he and his wife lived on the same place in 1921. With the help of his brother, father-in-law, and wife, he put in about the same amount of corn and oats. His wife helped, plowing, milking, and doing practically all the chores. He plowed as much corn as he could when he was able. After two years on this farm, his income when he settled up was nothing. Some farmers had more and some less stock than he had.

Charles E. Baker: When he saw plaintiff when he was on his first farm, he never noticed anything wrong with plaintiff's condition or with his walking.

Fred Elsinger: Plaintiff's father-in-law. He did not observe a great deal as to the effect of farm work on him in 1920. He practically furnished a team and man to him the whole of 1920. He saw him try to work, and he just quit with a pain in his back. He could tell that from his movements. He could not stand to ride machinery. He placed his hand on his back and told him it was in his back. His face appeared as though he had a pain in his back. When he got off machinery, he would hold his back and straighten up. He tried to drive a binder for him in 1920, did it an hour one morning, then went to the house and said he would do it during the noon hour. He had pain after the hour's work on the binder, and laid down on the porch. He saw him in 1920 try to cultivate corn and fail, working only about an hour or so and then going to the house and suffering from the work. He donated a man to plaintiff in 1920. In 1921, he also rendered assistance. He often sent one or two men over to help. Plaintiff had the same trouble in 1921 that he had in 1920. On cross-examination, he testified that plaintiff's brother was with him practically all 1920. He had seen plaintiff cultivate corn, plow ground, and do all kinds and types of farm work during 1920. He was fairly well stocked when he started out on this farm. Witness did not have a hand at plaintiff's all the time during 1920, but at cultivating time, crop time, threshing time, and corn shucking time. Sent over men when plaintiff was busy or behind in his work.

George Green: Was plaintiff's brother. Worked first with him on the Pipol farm. Helped out and was paid for his work. There were days when plaintiff could not get out to do anything at all, and other days, he did fairly well. On the former days, he had no strength in his back at all. He had a bad look in his eyes when suffering that way. Had seen him catch himself (indicating) and try to straighten up. He did not work over a third of the time on the Pipol place. On cross-ex-

amination, he testified: He was with plaintiff in 1920 on the Pipol farm from March to July and came back in corn shucking time in November. The two of them planted and cultivated a 100 acres of corn. Witness put in the oats and harvested them and also helped shuck corn in November. In 1921, the two of them put in the corn and cultivated it, plaintiff's father-in-law helping also. They also shucked the corn, plaintiff shucking very little.

Mrs. Gertrude Green: Plaintiff's wife. Married October 22, 1919. On Pipol farm, she milked, fed the hogs, did housework, helped in the field, helped to cultivate corn, sow oats, tried gathering corn unsuccessfully, and helped put oats in the seeder. In corn plowing, she drove a team to a cultivator. Second year on Pipol farm, she did about the same as she did first year. During the two years, she worked more than half the time in the fields during cultivating season. Plaintiff could not stand to work on Pipol farm and he got off his cultivator at the end of the field and rested, and he had a pad on his cultivator seat to ease the jar. He would bend over and put his hand on his back. He worked about a third of the time on the Pipol farm. Farm hands helped gather and haul corn, and scoop and shell it. His brother helped him, and her father sent over a hand and they hired a hand to help a while, this last working a couple of weeks. He and she sowed about 40 acres of oats. She lifted most of the oats to put them in the hopper and he drove the team because he could drive straighter rows. He probably put a third of the oats in the hopper. On cross-examination, she testified: She did what ordinary housewives do and worked also in the field. She helped sow oats and feed hogs, milked some, and did some cultivating. She plowed some corn in June, 1921, and helped sow oats in April. She worked right along in the field with the rest of them, not every day but most of the time. He had trouble with his back before 1921—had it in 1919 when he was hauling water for a threshing machine. He was in bed in 1921 when they were on the farm but he was down in his back before in 1919. He was down in bed in 1920 for four days at one time.

3. Johnson Farm (1922, 1923, 1924)

1922:

Plaintiff's testimony: In 1922 he leased the Johnson place of 160 acres and his brother moved over there with them and they tried to farm it together. He tried to work as usual and could not. His wife and father-in-law helped him. He could not shuck corn though he tried. On cross-examination, he testified: He planted corn and had about 80 acres of alfalfa but no other crops. He and his brother "split" what they had left. He worked when he could and his brother all the time. His brother stayed with him about a year.

George Green: Was with plaintiff two years on the Johnson farm of the three years they were there. First year there, plaintiff worked full third of the time and then after that seemed to be getting worse all the time. Plaintiff did not work over a fourth of the time the next two years. When plaintiff tried to do farm work, plowing and cultivating, a quick jerk or anything would almost jerk him in two. Had seen him raise up when cultivator stopped and catch himself and stop the team. Sometimes, he had to lie down. He would be in bed three or four days or a week at a time and could not get up. That happened off and on all the time he was there. On cross-examination, he testified: Plaintiff did not have much stock and there was not much to do until corn shucking time. Plaintiff and wife did chores together. His wife did what the ordinary housewife does. He and plaintiff, with three extra cornpickers, picked 120 acres of corn. Plaintiff also had alfalfa and pasture and a couple of milk cows. And, on redirect examination that, on the Johnson farm, plaintiff had two corn shuckers besides witness, and one man for corn plowing besides witness.

Mrs. Gertrude Green: On the Johnson farm, she helped cultivate corn. Customary for average farmer's wife to drive a cultivator. Was not customary for average farmer's wife to plow corn, and she plowed some each year they were on the Johnson place. She did not do any other field work, but did housework and milked and fed the hogs. They had three or four hands on the Johnson farm, and George helped and her father sent over a hand.

1923:

By plaintiff: In 1923, he was on the same place, and hired a man continually from start to finish and three corn shuckers every fall to shuck his corn, and he was unable to do very much work. On cross-examination, he testified: He did all he could but had to have a hired man all the time. He hired a man to cultivate the corn three times, and also a man to help put in the corn. He worked when he could but did not work with the hired man all the time.

1924:

Plaintiff: In 1924, he was on the same place, and his condition was about the same as in other years, he not being able to do much. He did practically the same amount of work. His brother moved back

with him, and the two of them, his wife, and hired help farmed the place. In 1922-1924, inclusive, there were no earnings above debts. He and his brother had about 4,000 or 5,000 bushels of corn. He did not really get living expenses out of the farms but was left "in the hole."

T. L. Jones: He bought out the plaintiff on the farm, buying the hay and corn right on the place. Plaintiff seemed like he did not have "very much push" behind him. On cross-examination, witness said that it was about 1923 when he saw plaintiff, and he never saw him before that time and knew nothing of his condition between the date of his discharge and 1923.

Roy Steele testified that, on the Johnson farm, plaintiff had three men shucking corn.

Roy A. Phillips: Knew him on the Johnson place, but not prior to the time he went into the Army. Observed him doing light work, seeming to take his time and to move slowly. He walked carefully. They attempted to exchange work, plaintiff coming over to his place with the idea of holding out on his end of the work, and he would work "good" for a short period. They were threshing, plaintiff hauling bundles and plaintiff would work three hours in the morning and then tire out and weaken. He could do certain work better than other kinds. This condition continued all the time witness lived there (three years). Plaintiff would tell witness he got tired in stooping over, that being harder than other work, and he would have a difficult time straightening up. He walked carefully, limping some, and had a difficult time turning around, his whole body turning at once. He hired help to shuck his corn every one of the three years. The condition of his back and his inability to work were real and not imaginary. The only thing that led witness to believe that plaintiff was in pain was what he would tell him. On cross-examination, he testified: Plaintiff had some small grain and raised some corn and hay, the whole 160 acres being in cultivation. There were about 5 or 6 acres waste land. Plaintiff's average acreage of corn during the three years was about 125 or 130 acres. During that time, witness had about the same amount of corn, and witness hired help in shucking his corn mostly every year.

Fred Elsinger: When plaintiff was on the Johnson farm, witness would hire a man and send him out to plaintiff's. His attempts to work on the Johnson farm were the same as in 1920 and in 1921.

4. Coleman Farm (1925)

Plaintiff's testimony: In March, 1925, he moved to the 120-acre Coleman farm. His brother came over and helped him put up his alfalfa, and his brother and two others put up his alfalfa hay. He did about a third of the work of a farm hand on the Coleman place. When his brother and two others put up his alfalfa for him, they charged him nothing for their services. On cross-examination, he stated that only his wife, children, and he lived on the Coleman place, that he and his wife farmed this place and he did all he could, and that he hired help and did not do a third of the work that was done.

Charles E. Baker: When plaintiff was on the Coleman farm, he saw him walking towards the barn. He thought plaintiff had a "catch" and he jokingly told him that he was failing awfully for a young man, and plaintiff told him that "he had had lots of bother from the time he got hurt in the army." Said it was his back that was affected. He walked like a person who had been hurt and as though something bothered him. At that time did not have a normal, robust appearance and "did not step out as a healthy man working in the outdoors would do," but walked as though it were very hard for him. Witness was never there when any work was done, and knew nothing about how it was done or who did it. He stated that when he saw him walking to the barn on the Coleman place, he looked sick and when he started to walk he would stoop and bend over. It was the expression on his face that gave witness the impression he was in pain. Said that ever since he was hurt in the Army his back had bothered him, and he "looked it that day," because, when he started to walk he would stoop and bend over.

T. L. Jones: Jones worked for plaintiff. Seemed like he could not do anything. He could not shovel corn, and witness thought it was in his back, the way he acted. He could not bend over. Tried to scoop corn, but could not lift it up into the wagon. Witness would say he was lame in the back. He had seen him start to work and quit. Witness had been to his house when he was in bed, and did not get up out of bed. He never did anything—on two different occasions, witness saw him start to work in the morning, work about thirty minutes and quit. He was going to shovel corn, but he shoveled like an "old woman shovels a load" and then quit. Witness observed it was in his back, and he complained of his back.

Albert Bahr: Never knew plaintiff before he came to Coleman farm. He was slow and easy going, and would get out on the farm at 9 or 10 o'clock in the morning. He would "dinky" around, his wife helping. She helped to do the culti-

vating. He could do little. He rode a plow. Witness saw his wife there every day or two, sometimes every day. Plaintiff had about 25 acres of oats on the Coleman place, and witness harvested them, because he could not stand to ride a binder. Plaintiff did not husk his corn while on the Coleman place, but had some young fellows do it. He might have husked a little. Witness and two others put up his alfalfa, plaintiff doing no part of the work. Witness could not say who cut the alfalfa. Witness cut the oats. Witness helped him take a cow and calf home, because he said he could not stand to be jerked around by a cow with a young calf. Witness was never at plaintiff's when he was in bed, but he did not look well, but was pale, hollow faced, and poor, and would drag around and had no life about him.

Fred Elsinger: He gave plaintiff assistance when he was on the Coleman farm, sending over one of his hands when he needed help. The effect of plaintiff's efforts to work on this farm were the same as before.

George Green: Helped plaintiff on the Coleman farm about a fourth of the time. Plaintiff's efforts to work on this farm were something like his efforts on the Johnson and Pipol farms, and he had the same experience with his back. On Coleman farm, he hired a man through harvest, and hired a man to run the binder through oats cutting, and corn plowing (besides witness).

Mrs. Gertrude Green: On Coleman farm, hands helped to cultivate corn, make alfalfa hay, cut oats, shock oats, and shuck corn. She helped cultivate the corn.

He first got a car in 1925, which he drove.

5. Conservative Place (1926, 1927).

1926:

Plaintiff's testimony: In 1926, he rented the Conservative place next to his brother. His condition on that farm was never any better. He tried to plow for corn, sow oats, and to shuck corn, and had to have his corn hauled.

1927:

Plaintiff's testimony: He had a sale in 1927, and his brother, wife, and he went to Gallatin, Missouri. Gross earnings for 1926 and 1927 were a little more than $300 or $400. Had stayed on the same farm in 1927, his condition being no better. His wife did the biggest part of the work and he hired the corn shucked in the fall.

Charles E. Baker: Witness was at the above farm twice during corn plowing season, and plaintiff did not attempt to work at that time. He did not look well, and said he could not farm because he was not strong enough and could not do it. Previously, witness had talked with him about his back being affected. Witness did not notice *anything* particularly wrong with him working at that time. He did not complain of his condition at that time, and there was no conversation at that time relative to his physical condition. Witness saw him again when he was selling out, and he did not look well at that time and said that he could not farm and was quitting. On cross-examination, witness testified, relative to plaintiff's activities on the Coleman farm, that witness did not observe him at his work until 1925, when he was on the Coleman place, and did not until then notice anything particularly wrong with him. But he noticed a great change in him on that farm. The first year he farmed, witness did not notice any change in his walking. He noticed a change in him on the Coleman farm, but could not state whether his trouble had progressed, and noticed no change on the first farm. And, on redirect, witness stated that, during the time he knew plaintiff, the latter was a man who usually stayed through on the job and was a satisfactory farm hand.

Roy Steele: Had been over to plaintiff's in 1926 or 1927 and found him in bed in the daytime. When he was moved in the bed, he would say his back hurt. He had also seen him when he was not in bed, and noticed he could not raise up very well after stooping over. He held his back with his hand. When plaintiff exchanged work with witness, plaintiff did heavy work, what he did of it. He would stoop and shovel a while, and then would stop and lean on his shovel, would stand there a while and bend and straighten up. Witness had to help him load a car of corn. He was going to help witness overhaul the latter's car, but, when they got started, he said he could not go anymore and had to give up working on the car. Plaintiff lifted the engine around, crawled under the car and tightened the rods, and ground the valves, but could not stand to stoop over the car to grind the valves. He tried to work all he could. He did not have the appearance a strong man would have but looked pale and poor. Plaintiff's 80-acre farm was practically all in corn and he hired his corn shucked. He tried to shuck, but would shuck a little and then lay off. Plaintiff's brother helped on the above farm for one year, but, in 1927, plaintiff farmed the place himself. He had somebody there shucking corn, but witness never saw his wife do any shucking. He had seen her help with the hogs and things

taurant. His last attempt was with a farm near Winston. The testimony covering the time in Gallatin, in Winston, and on the farm near Winston is as set out in footnote [3]. The

like that. He acted like a man "dragged down" and without strength and ambition. He walked slowly, and, although he lifted pretty heavy objects when working on witness' car, he did not finish working on the car.

Fred Elsinger: On the Conservative farm, witness rendered some help for one year, and the effect of work on plaintiff as to pain was the same. On cross-examination, he said that plaintiff lived and farmed continuously on several different farms from 1920–1927. He then testified as to plaintiff's stock and crops while on the farm, and that he had seen him drive an automobile over the country roads and go to town to do what business he had to do.

George Green: George was with him most of the first year on the Conservative farm. Plaintiff worked about a third of the time on this farm, the effect of work being about the same as before. When he would shock oats and stoop down to pick up a bundle, it seemed like he could not get back up. He would drop the bundle, catch his back, and straighten up. He would stand there for a few minutes and tremble. He tried to help with threshing and could not; pain would come into his back. Witness saw him try to work and then tremble for a few minutes a dozen times or more. He tried to do all he could, but, after one of those pains, he would be laid up in the house several days or perhaps two weeks. On the Conservative place, they had 80 acres each and George took care of nearly all of it, plaintiff not being able to do anything. He worked some on his 80 acres and George helped him, but he never helped George. He paid George for his work. From 1920–1927, George saw him doing a little of all types of farm work. First time he was in bed was on the Pipol place and was in bed 3 or 4 days. In 1923, the first time he had a doctor after he got out of the service, he was in bed ten days. When exchanging work, he usually sent George in his place. On the Conservative place, he had three men at one time besides George, and the first year there, he had two men besides George.

Mrs. Gertrude Green: On the Conservative place, hands cultivated and shucked corn, and scooped and helped haul it away. On all the farms on which they lived, she helped in the fields. The effect of work on her husband on all these farms was the same, except that he kept getting worse all the time, and the pains were more frequent and severe.

Plaintiff: During time he was in Nebraska, he did not exchange much work with neighboring farmers, except when he hired men and sent them to do the work. He went over to one neighbor's and tried to help but the neighbor did not ask him to work very hard. Such neighbor had helped him lots of times. He also had hauled some corn for another neighbor in 1922, 1923, and 1924. It was in 1925 that he had exchanged work with the first neighbor. He did not recall having gone to any other farms and worked, although he had sent a hired hand over to two other neighbors, apparently in exchange for work.

6. Earnings of these various farms.

Plaintiff: He did not know how much he earned on these various farms since the war. It took it all to pay debts. Earnings did not suffice to pay operating expenses, and he borrowed money from various sources to pay them. There were no net earnings above the actual expenses of operation.

Mrs. Gertrude Green: It took more to operate the farms than was made off them. Plaintiff borrowed money and they paid out more than they took in.

[3] Plaintiff's attempts to work for Downing.

Plaintiff: He sold out from the Conservative farm in 1927, and moved to Gallatin, and, since then had been treated by Dr. M. A. Smith. He tried to set out some bulbs, and pick up some shingles, and mow a lawn for Mrs. Lester Downing, but his back got so weak and pained he had to go to bed for three weeks. Before moving to Winston, about all he did was work for Mrs. Downing.

Lester E. Downing: First time witness saw him after the war was when he moved to Gallatin. He tried to do some work at witness' house and could not. Tried to pick up some old shingles, worked about an hour, and could not, and witness had to get somebody else to do the work. Seemed to be stiff and in pain and could not get down to pick up the shingles. Would get down like a man 80 years old. Two weeks later, he tried to put out some canna and dahlia bulbs in the garden, and witness sent another man out to set out the bulbs. Also tried to mow witness' lawn and could not. Witness saw that his efforts to push the mower caused him pain, and he could not do the work. On cross-examination, witness testified that, when plaintiff tried to mow the lawn, witness was there only fifteen or twenty-five minutes, and, when plaintiff could not do

medical testimony is as set out in footnote[4]. The *outline of testimony* stated in this opinion and footnotes is entirely from testimony of witnesses placed on the stand by plaintiff and none of whom were hostile to him. The defendant presented testimony, both lay and

---

the work, he went home, the yard not being completed and he having mown only two or three times across the yard.

Restaurant at Winston.

Plaintiff: Went to Winston and tried to operate a restaurant, tried waiting the tables, carrying water, helping wash the dishes, and wait the counter, but it pained his back and made it weaker all the time. He remained in the restaurant about two weeks, and then went back to Gallatin. On cross-examination, he stated that his wife cleaned up the restaurant and he did not do anything except try to carry some water. He operated this restaurant only about a week or two, and attempted to wash dishes, wait on customers, and carry water but could not. Since there was not enough business to pay him to hire help, he quit.

Farm at Winston.

*Plaintiff:* He and his brother then leased a 40-acre farm near Winston, and he tried to farm it in 1928. He tried corn planting but it pained and weakened his back. He lived on that farm from May to December, 1928, and then moved back to Gallatin. He had not done any work since moving off the 40-acre farm, and his back was in such a shape that he could not even put on his hose or shoes or take them off. He had been in the Veterans' Hospital eleven weeks; there was a pain in his back all the time and, when he exerted himself, it put him in bed. On the above farm, George did about all the farming, plaintiff trying to plant corn and cut brush but not being able to do it. Plaintiff tried to raise chickens but could not and was in bed seven weeks. He had been in bed several times before that. He borrowed money, bought 500 chickens, and lost nearly all of them. He was in bed and his wife could not look after both him and the chickens so the latter died.

R. R. Everett: His farm adjoined the above farm that plaintiff rented in 1928. Witness could not say that he saw him do any work that amounted to anything and could not say that he really saw him working. What times he saw him, somebody else was working. Witness once tried to get him to do some work for him, but he seemed to be down in his back and could not help. Witness sent for him a time or two and every time the report was that he was down in his back. One time, he was not able to come to the door and witness went into the house and he was sitting in a chair on a pillow. Seemed to sit as though his back were stiff. When he turned his body, he turned it altogether at that time. Sometimes, he moved better than at other times, and sometimes he seemed to walk about pretty well, but, at other times, he walked kind of stooped over as though it hurt him. Cross-examination: Apparently, witness had only seen plaintiff once before he tried to hire him. Plaintiff never plowed, no plowing being done on the farm so far as witness could recall. He did list his corn and did some farm work. Witness did not know who did the listing. Witness was over at his house once when he was sick and was sitting in the chair as before described. He was over at plaintiff's three or four times during the year. Redirect: Witness could not say that plaintiff did the plowing, and he was there only once when he saw him in the chair. Recross: Plaintiff drove a truck past witness' place quite often, and his wife was usually in the truck with him.

Other testimony.

Walter Reynolds: He knew plaintiff since 1928, and never saw him do any work. He came over to witness' well to get some water and it looked as though he could hardly pick up the bucket. He did not pick up the bucket and walk off with it like witness would. He had his left hand on his back when he picked it up, and looked like he was "in misery." Witness could not say he saw him do anything after that. He walked like he was "in misery" more than once. Witness saw him do nothing else in the way of work. He had been at plaintiff's house when he was lying on his back in bed, and had seen him in bed more than once. He lived near witness for a month or two months, and, after moving away, plaintiff moved back near witness several months later. Witness saw him in bed about three or four times in the period of a year.

Lawrence Millstead: He never saw plaintiff do any work while in Gallatin, but had seen him walk around his house and yard a little, and he seemed to walk around in a stooping position. Had not seen him try to do any work at all. What work he ever saw done, in the way of carrying coal, water, etc., was done by Mrs. Green. Witness could not say how much of a garden plaintiff had in 1929, did not see his wife taking care of any garden, and did not know who took care of it.

4 Plaintiff's testimony as to treatment by doctors.

The first doctor he had after leaving the Army was Dr. John Buis, in 1922 or 1923. That doctor saw him several times

medical, to the contrary, but we have taken no account thereof.

Taking the case thus made by plaintiff and drawing such reasonable deductions therefrom in his favor as seem justified, we think the situation is, concisely stated, as follows: The injury from the fall of the boat upon plaintiff is the source and cause of his subsequent trouble and condition. He did not believe he was totally or permanently injured until some years after he left the service and after this contract lapsed. He endeavored to do the kind (farm) of work he had done before entering the army. He was never able to do some kinds of that work —such as required lifting or back strain— and there were other kinds which caused him discomfort and, at times, pain. There were other kinds of farm work which he could do. As a result of this condition, he did about a third of the work required on a farm for several years after leaving the service. This work included general farm work with the exception of some kinds (as above indicated)

before he called him and saw him professionally only once. He examined him and gave him a shot for lumbago. That was in the fall in corn shucking time. Later, he made one visit to doctor's office. He was examined once at his home and once at the doctor's office. Dr. M. A. Smith of Gallatin examined him in 1928 and he has been under his care since January, 1928. He was examined by government physicians after making application for compensation in July, 1928. He saw Dr. Smith professionally about once a month or a little oftener. He was in the government hospital at Excelsior Springs several months, leaving in September, 1929. That was the first hospitalization he had since leaving the Army. The first time he communicated with the government after being discharged was when he made application for compensation in 1929. On redirect examination, plaintiff stated the reason he did not call a doctor before 1922 or 1923 was because the doctors did not do him any good, and the Army doctors had told him they could not do him any good. He consulted Dr. Buis professionally different times at his office before he consulted him at plaintiff's home. Upon recross-examination, he said he saw Dr. Buis at his office several times, but the first time the doctor treated him was at his home in 1922 or 1923.

Testimony of Doctors.

a. Dr. James Christiansen.

He saw plaintiff after he was injured, witness being with the same regiment. He could not stand up and was put to bed and kept there several days because of severe injuries. The cause of his not being able to stand up was the traumatism to his back. He was in bed several days and was then permitted to get up but was not able to do work of any kind. He could not do the work of the engineer regiment so was sent to headquarters for lighter work though he wanted to stay. After the injury, the work he was doing was too severe and he could not do it as before, but could do only light work. He understood plaintiff insisted on staying in the Army but was sent to headquarters for lighter work. The main treatment prescribed for him was rest. Saw him several times a day or at least once a day while at the camp after the injury. At time of his transfer, he was unable to do any severe labor or any labor that would take any moderate physical exertion. At the time witness treated him, his opinion was that the disability would continue several years.

Cross-examination: Witness had him stripped and put to bed. He was helped to the camp by others. because of his injuries. The examination conducted by witness was palpitation of the muscles and determining their rigidity, as to whether there was tenderness which was proved by rigidity of the muscles. The injury was on the back over the pelvic-lumbar region. Quite an area was injured because he was quite severely injured, and quite an area that was tender at that time was more towards the lumbar region. He stayed in his bed in his tent. Witness made no diagnosis of his condition at that time other than traumatism.

Witness did not find arthritis of the spine and vertebræ, because he had no X-ray equipment there. However, he had the symptoms of arthritis at that time, judging from the rigidity of the muscles of the back and tenderness which are symptomatic of arthritis. Witness made a thorough examination as far as he could without the use of X-ray, but could not state definitely that he had arthritis of the spine and vertebræ at that time. He did not find infection of the sciatic nerve or atrophy of the lumbar muscle at that time.

Witness' examination of him extended over a period of several days. Witness was asked and advised in regard to his transfer. He probably had no arthritis of the spine at the time of the examination.

Redirect examination: He had symptoms found in arthritis of the spine by the rigidity and tenderness of the muscles. In arthritis, it is necessary to have X-ray pictures to show the osteoarthritis of the

which he could not do at all or only for limited periods or in limited amounts. His trouble and condition grew progressively worse until he was practically totally disabled when he went to Gallatin, in 1928. He has grown no better since and probably will not. The result of what has been said above in this paragraph is that he was not totally nor permanently disabled at the time this contract lapsed.

Another consideration which may be mentioned is as follows: In the Lumbra Case, about ten years had intervened between the lapse of the contract and the claim thereunder. That situation is here present for this contract lapsed in July, 1919, and claim was made in 1929. As to that situation, the Supreme Court, in that case, said: "In the absence of clear and satisfactory evidence explaining, excusing, or justifying it, petitioner's long delay before bringing suit is to be taken as strong evidence that he was not totally and permanently disabled before the policy lapsed" [citing United States v. Hairston, 55 F.(2d) 825, 827 (C. C. A. 8); Wise v. United States, 63 F.(2d) 307, 308 (C. C. A. 5); United States v. Linkhart, 64 F.(2d) 747, 748 (C. C. A. 7); Eggen v. United

spine, but muscle rigidity is symptomatic of arthritis. Witness would have put him in a hospital had they been in a camp other than where they were at the time. He was in bed several days and witness would not let him move—he was helpless and had an acute injury.

b. Testimony of Dr. John Buis.

Examined him November 13, 1923, at which time he complained of his back, could hardly walk, and had difficulty in getting home. Examined him again November 26, 1923, at which time he was unable to walk and complained of his back. Took X-ray pictures of his teeth and gave him some medicine. The diagnosis was indefinite. The only diagnosis ever made was sacroiliac synchondrosis. Next examined him March 26, 1926, and he then complained of the same thing. Could not say what the extent and probable duration of the disability was. Some of these patients never get well. He was unable to walk when Buis made the examination.

In answer to the question, was the disability he found on examination a permanent or a temporary one, Buis stated "it was temporary at the time you say —these cases are acute but never recover completely, they may recover to the extent to be up and around but still have the pain there." The cause of the disability was not definitely determined, but the history given was the injury from the pontoon boat.

Cross-examination: When he first examined on November 13, 1923, the condition was acute and was the same on November 26, 1923, "except that it was exacerbation." Did not see him again professionally until March 26, 1926. His teeth were not the cause of the pain in his back. Neither were his tonsils. Diagnosed case both from the history plaintiff gave him and his physical findings. "Synchondrosis means a stretching of the ligaments between the sacrum and the iliac, a separation of the sacrum and the iliac. Synchondrosis does not mean strain, it means separation of those joints there." He first examined at his home and next at the office. He was bed fast at the time of the first examination.

Had treated many synchondrosis strains and they never proved fatal. In treating such, the suffering can be relieved for a time, and the pains are more severe at times than at other times. Sometimes, the condition totally incapacitates a man. Condition was practically the same at the time of the March 26, 1926, examination as at the time of the first.

Redirect: Synchondrosis "is a tearing of the ligaments causing a separation between the sacrum and the iliac. There is nothing that the force of nature can do because the circulation in the ligaments and tendons is deficient. There is very little circulation and as a result the process of repair is defective." On March 26, 1926, nature had not repaired the injury found on the first examination. Buis could not say it would be permanent, but there was very little effort of repair being made in the three years. On recross-examination, he said that sprained ankle is different than synchondrosis "because the sacrum rests like a keystone between two arches, you take where the brick is loose, the rest of them will come down."

c. Testimony of Dr. M. A. Smith.

He had examined and treated plaintiff beginning in July, 1928, and had seen him, at times, from once a day to two or three times a month, depending upon how he felt. The occasion for his seeing him would be that he would be in great pain. Was frequently in pain for two or three days or weeks at a time.

The point of tenderness and the point of disability in a general way was in the lumbar-sacral region—in other words, the top of the hips and the small of the back were weak. The point of the greatest injury was to the sacral lumbar joint or junction and also strained tendons which connect the sacrum. There was also a

States, 58 F.(2d) 616, 618 (C. C. A. 8)]. Even if our conclusion that the evidence results as set forth in the just preceding paragraph be incorrect, we feel certain it cannot be said that the evidence clearly and satisfactorily explains this delay and overcomes the "strong evidence," arising from such delay, that no such disability existed at the time this contract lapsed. The character and present condition of the plaintiff has so appealed to us that we have given the most careful and painstaking study to every word of this evidence and have tried to resolve every doubt in his favor lest we unintentionally do him an injustice. We are forced to the conclusion that he was not permanently and totally injured at the time this contract lapsed and that the case should not have been submitted to the jury.

The judgment must be and is reversed and the case remanded.

Judge KENYON, who participated in the hearing and determination of this case, died before preparation of the opinion. However, he was in favor of reversal of the case on the grounds which have been set forth in the opinion.

---

fracture at the base of the iliosacral joint on the left side, which caused an impingement of a nerve coming out of the spine. He also had a weakening or a shrinking up of the muscle extending from the sacraliliac ridge up to the ribs. After illustrating and stating further the nature of the injury, the doctor said that the tendons were strained, stretched, and pulled apart enough to cause a "continuous and permanent injury," and that, in his opinion, the injury that he found was a permanent one. The boat falling on him would be sufficient to cause the injury described. The witness prescribed rest in bed and strapped his back—"that is about all a person can do, there is not much treatment that I know of." "There is no operation I know of that will remedy his condition." "The effect of this injury on the ability of the plaintiff to labor is that he rests up and gets to feeling a little better, then he tries to work and brings it all back, gets to feeling a little better, and one or two hours work will ruin the whole thing."

Cross-examination: At the time of his first examination, witness made a general physical examination and examined throat, nose, eyes, and chest. He had infected tonsils, some bad teeth, and some catarrh of the nose and throat, and, outside of that with the exception of his back, the physical findings were practically negligible. On examining back, he found a shrinking up of the left lumbar muscle and sensitiveness of the left sciatic nerve. Also, a prominence of the sacral bone and a general sensitiveness to pressure over the lumbar sacral joint. On being questioned in regard to statements in a letter by witness to the Veterans' Bureau, dated July 1, 1928, wherein witness said the disability was not less than 50 per cent., that he thought the disability was not less than 50 per cent. at that time, and that he later made a more thorough examination than he had at the time he wrote the letter—such later examination resulting in findings above set out.

Witness' diagnosis in this case was traumatic synovitis at the lumbo-sacral joint and traumatic strain at the iliosacral joint. Bad teeth and tonsils did not indicate anything to witness in regard to this particular injury. Witness knew of one other case like this where the injury was caused by a fall, but did not know whether or not it healed but it could heal. Witness thought the sciatic nerve injury or symptom was following the original accident.

Also plaintiff testified in rebuttal that his tonsils were extracted in May, 1929; that there was no change in his condition whatever; that he had never had throat trouble of any kind; that no doctor had ever found anything wrong with his teeth; that there was never anything the matter with his arms and his left shoulder was a little sore for about a week or two; and that there was never any stiffness in his spinal column in the upper part, and no grating in his arms and shoulders when moved.